**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

ERIKA R. BROWN,            :
                                     :
              Plaintiff,          :     C.A. No.: K24C-02-028 JJC
                                     :
        v.                            :
                                     :
TRANSFORMING LIVES, INC., and   :
AKOBEN, LLC,                 :
                                     :
             Defendants.       :

Submitted: December 16, 2025
Decided: January 23, 2026

## <u>MEMORANDUM OPINION & ORDER</u>

Erika R. Brown, Ed.D., Townsend, Delaware, *Pro Se Plaintiff*.

Michele D. Allen, Esquire, and Ashley C. Azato, Esquire, ALLEN & ASSOCIATES, Wilmington, Delaware, *Attorneys for Defendants Transforming Lives, Inc. and Akoben, LLC*.

**CLARK, R.J.**

Plaintiff Erika Brown (hereinafter, "Dr. Brown") sues two companies for three separate claims of employment discrimination. She brings those claims under the Delaware Discrimination in Employment Act (hereinafter, the "DDEA"). She also sues one of those two businesses for whistleblower retaliation. She brings that claim under the Delaware Whistleblowers Protection Act (hereinafter, the "DWPA").

As background, Defendant Transforming Lives, Inc., (hereinafter, "TLI") and Akoben, LLC (hereinafter, "Akoben") are separate business entities that provide educational consultant services to colleges, schools, and other businesses. They are parties to a shared services agreement, and they share the same chief executive officer who refers to them as "sister companies." Dr. Brown contends that TLI and Akoben jointly employed her for purposes of her discrimination claims. TLI, on the other hand, contends that Akoben has been her only employer.

Discovery has concluded. TLI and Akoben (hereinafter, collectively, the "Companies") move for summary judgment on all claims on multiple grounds.

First, TLI alleges it has never been Dr. Brown's employer which means it cannot be held liable under the DDEA. Dr. Brown counters that multiple entities can be considered joint employers for purposes of the DDEA under the right circumstances. As explained in this Opinion, a reasonable jury could conclude that the Companies jointly employed Dr. Brown for purposes of potential DDEA liability.

Second, the Companies collectively seek summary judgment on Dr. Brown's three DDEA claims because she cannot satisfy at least one necessary element of each claim. Dr. Brown claims that the Companies violated the DDEA when they: (1) discriminated against her because of her gender when they refused to hire her for a new curriculum specialist position; (2) subjected her to a hostile work environment; and (3) retaliated against her by not hiring her for a new curriculum specialist position with TLI (the "new position") because she reported that TLI's director had

2

mistreated her. For the reasons to follow, summary judgment in favor of the Companies is appropriate regarding all three claims because there are no facts to support inferences that satisfy at least one necessary element of each claim.

Third, Dr. Brown separately alleges that Akoben retaliated against her in violation of the DWPA when she reported that a director urged her to commit fraud. On that claim, Akoben seeks summary judgment alleging that (1) she never alleged a "violation" when making the complaint, and (2) there are no facts to support that there was a "violation" in fact. As explained below, the record does not support an inference that the complained-of conduct qualified as a violation under the DWPA. Nor, alternatively, does it support an inference that Dr. Brown held a reasonable belief that Akoben had committed a violation. As a result, summary judgment in favor of Akoben is appropriate on the DWPA claim as well.

## I. FACTS OF RECORD AND PROCEDURAL BACKGROUND

The facts recited herein are those in the summary judgment record considered in the light most favorable to Dr. Brown as the nonmovant. In this facts and background section, the Court deviates from a strictly chronological recitation of the facts. It focuses first on those facts relevant to TLI's status as Dr. Brown's employer. Then, it recites the facts relevant to the disputed elements in Dr. Brown's three DDEA claims. Finally, it does the same for her DWPA claim.

TLI and Akoben (again, the "Companies") are separate business entities. They operate, in their joint chief executive officer's words, as "sister companies," with their employees operating under a shared services agreement.[1] The agreement recognizes that some of the Companies' employees provide services to both entities,

---

[1] D.I. 82, Ex. 1 at ¶ 3.

but it also provides that those employees are separately employed between the two businesses.[2]

Dr. Malik Muhammad served as the chief executive officer of both Companies throughout Dr. Brown's employment.[3] His affidavit's description of their books of business confirms significant overlap between the two. Namely, both Companies train, assist, and provide educational consultation services to schools, universities, and businesses.[4]

According to Dr. Muhammad, TLI hired Dr. Brown on March 5, 2021.[5] She signed and returned an offer letter to TLI on March 10, 2021.[6] Dr. Muhammad contends by affidavit, however, that she never started work for TLI because she accepted a position that he offered her with Akoben shortly thereafter.[7] According to the Companies, Akoben managers were the only persons who conducted her performance evaluations.[8] Furthermore, they submit evidence that supports that Akoben—not TLI—maintained control over Dr. Brown's employment from the start of her employment in March 2021 until it concluded in June 2022.[9]

Dr. Brown counters TLI's position regarding her employment status with facts that she contends support a joint employment relationship. First, she testified in her deposition that she understood Akoben's job offer *to be in addition* to the TLI offer.[10] She, after all, accepted both offers.[11] Furthermore, according to Dr. Brown, Dr. Muhammad remained her supervisor throughout her employment, and she

---

[2] *Id.*
[3] *Id.* at ¶ 2.
[4] *Id.* at ¶¶ 4-6.
[5] *Id.* at ¶ 7.
[6] D.I. 82, Ex. 2.
[7] D.I. 82, Ex. 1 at ¶ 8.
[8] D.I. 82, Ex. 6 at 97:16-21, 96:20-23.
[9] D.I. 82, Ex. 1 at ¶ 9.
[10] D.I. 82, Ex. 6 at 87:2-8.
[11] *Id.* at 120:14-16 ("I was the only employee who was actually employed by both sides.").

performed employment functions for TLI throughout. She testified that Dr. McAllister, who was the director of operations at TLI,[12] later became her Akoben supervisor as well.[13] In addition, Dr. Brown's W-2s listed "Transforming Lives Inc" as her employer throughout her employment, from start to finish,[14] and she maintained a TLI email address throughout.[15] She also emphasizes incidents where Dr. McAllister exercised significant control over her day-to-day work. For instance, he required her to copy him on every email she sent.[16] Dr. Brown also submitted an email chain into the record where she attached a PowerPoint for Dr. McAllister to review, and he responded with suggestions.[17]

At some point after Dr. Brown started work, Dr. Muhammad encouraged her to apply for a newly-created position at TLI.[18] He told Dr. Brown that the job was "hers to lose."[19] In fact, he even asked her to draft the job description for the new position.[20] When she sat for the interview in April 2022 with Dr. McAllister and two other interviewers,[21] however, she was allegedly combative and refused to respond to certain questions.[22] She telegraphed her offense about being asked basic interview questions,[23] and her displeasure that someone had edited the job description she drafted.[24] Dr. Brown also admitted through text messages to one of the interviewers that she had not conducted herself appropriately during the interview, and she

---

[12] *Id.* at 194:11-14.
[13] *Id.* at 135:9-16.
[14] D.I. 41, Ex. 26.
[15] D.I. 82, Ex. 6 at 121:23-122:3.
[16] *Id.* at 277:19-278:21.
[17] D.I. 37, Ex. 21.
[18] D.I. 82, Ex. 1 at ¶ 14.
[19] *Id.* at ¶ 15.
[20] D.I. 82, Ex. 6 at 242:11-17; *id.* at 138:24-139:11; *see also id.*, Ex. 21.
[21] D.I. 82, Ex. 1 at ¶ 16.
[22] *Id.*
[23] D.I. 82, Ex. 8 at ¶¶ 4, 5 (affidavit of William Fuller).
[24] D.I. 82, Ex. 6 at 138:24-139:11.

apologized for her behavior.[25]  To that end, she admitted she did not "show up as [her] best self."[26]  TLI did not offer her the position after the interview.[27]

Dr. Brown attributes the denial of the position alternatively, or in combination, to (1) gender discrimination, and (2) retaliation for complaints she had made about gender discrimination to the Companies' joint human resources director.[28]  As to the latter, she testified that she reported that Dr. McAllister and others had treated her unprofessionally to human resources.  There are no facts to support that her human resources complaint asserted *gender-motivated* disrespectful behavior, however.[29]  Moreover, the record provides insufficient facts to infer *when* she made the human resources complaint – that is, did she make the alleged complaint before or after TLI decided not to offer her the newly created position?  To this end, she could only estimate that she made the complaint around April 2022.[30]  She had interviewed on April 5, 2022, which leaves the sequence between the alleged complaint and rejection unresolved on the record.[31]

Dr. Brown alleges four separate incidents or behaviors that support her hostile work environment claim. First, during her initial interview, Dr. Muhammad commented that he "needed a woman on the team."[32]   Dr. Brown testified in her deposition, however, that she could not ascertain Dr. Muhammad's intent in making that statement.[33]  He ultimately hired her; in fact, he sent her job offers from both TLI and Akoben.[34]

---

[25] D.I. 82, Exs. 8, 9.
[26] D.I. 82, Ex. 9.
[27] D.I. 82, Ex. 1 at ¶ 17.
[28] D.I. 82, Ex. 6 at 137:22-141:6.
[29] *Id.* at 137:28-138:9; *id.* at 140:3-10; *id.* at 156:15-21.
[30] *Id.* at 155:18-156:3 ("I believe – I believe I made it around April.").
[31] *Id.* at 270:11-14.
[32] *Id.* at 143:8-9.
[33] *Id.* at 143:10-12 ("And I didn't know what it meant. I still don't know what it meant . . . .").
[34] D.I. 82, Ex. 2 (offer letter from TLI); *id.*, Ex. 3 (offer letter from Akoben).

6

Second, the record contains several isolated incidents and examples of conduct that Dr. Brown contends support her hostile work environment claim. For instance, she contends, and the Court accepts for purposes of this motion, that Dr. McAllister treated her unprofessionally at times. For example, facts of record support that Dr. McAllister regularly referred to her as "Erika" rather than by her appropriate title, Dr. Brown.[35] While those references were typically in the presence of other doctorate level employees,[36] the record includes a reference to one occasion where Dr. McAllister referred to Dr. Brown by her first name in front of teachers from a client school.[37] On a separate occasion, Dr. McAllister asked Dr. Brown to make copies for him.[38] And at another point, Dr. McAllister suggested that Dr. Brown, as opposed to another TLI or Akoben employee, fill in as a substitute teacher at a school.[39] Finally, Dr. McAllister suggested that the title of the new position with TLI should be changed from "Director of Education" to "Director of Teaching and Learning."[40] Dr. Brown took this proposed change in title as an attempt to "feminize the role in a sense or just take from it."[41] The Companies did not choose her for the new position.

Third, Dr. Brown's co-worker, Arisa White, learned that someone had used her log-in credentials for her computer while she was on leave.[42] When Ms. White told Dr. Brown, Dr. Brown became concerned that she could be blamed for it and could be accused of "fraud" as a result.[43] Dr. Brown brought this to the attention of

---

[35] D.I. 82, Ex. 6 at 135:3-8.
[36] *Id.* at 175:1-176:7 (Dr. Brown acknowledging that she referred to Dr. Muhammad as "Malik" in certain emails).
[37] *Id.* at 180:4-12.
[38] *Id.* at 136:7-19.
[39] *Id.* at 137:1-21.
[40] *Id.* at 139:14-140:2.
[41] *Id.* at 139:21-23.
[42] *Id.* at 140:11-21; D.I. 29, Ex. 3.
[43] D.I. 82, Ex. 6 at 221:10-19.

Patty Harris, the Companies' joint human resources director, who told Dr. Brown to "stay out of it."[44]

Fourth and finally, in late 2021 or early 2022,[45] a fellow employee, Suleiman Miller, who served as a program director at TLI,[46] physically blocked Dr. Brown from entering one of her client schools and growled at her when doing so.[47] Dr. Brown interpreted this as an attempt to "put me in my place as a woman . . . ."[48] She immediately reported the incident to Ms. Harris, who in turn informed Dr. Muhammad, who then addressed the issue with Mr. Miller.[49] Dr. Brown, Ms. Harris, and Mr. Miller later had a "sit down" to address the incident.[50]

Dr. Brown testified that she reported much of this conduct, with particular focus on Dr. McAllister, to Ms. Harris. Given the focus on Dr. McAllister, Ms. Harris told Dr. Brown to "get with the program" because Dr. McAllister and Dr. Muhammad were long time friends.[51]

Turning to the facts relevant to Dr. Brown's DWPA claim requires a narrow focus on a single complaint and a single act of alleged retaliation. Namely, Mr. Stephen Korr, a then-newly appointed director with Akoben, met with Dr. Brown and two other employees to discuss billing practices on June 17, 2021.[52] Mr. Korr had learned that some specialists were not documenting their discussions and emails with clients even though he considered such discussions billable under Akoben's

---

[44] *Id.* at 140:24-141:6.
[45] *Id.* at 148:14-18.
[46] *Id.* at 151:18-23.
[47] *Id.* at 142:1-10, 148:22-150:3.
[48] *Id.* at 142:18-19.
[49] *Id.* at 153:6-154:1.
[50] *Id.* at 150:22-151:3.
[51] *Id.* at 138:8-11.
[52] *Id.* at 311:14-17.

contracts.[53] He told the three employees that they would need to "get creative when it comes to these activity logs."[54]

Dr. Brown believed that this advocated fraud.[55] The factual record establishes, however, that Dr. Brown had not read the contract to determine what were permissible billing items.[56] In addition, Mr. Korr recites in an affidavit that "at no time during the meeting did I ever instruct the team members to alter their time or bills for services they did not perform."[57] Furthermore, soon after the meeting, Mr. Korr spoke to Dr. Brown by phone and reiterated that such discussions with clients, even if they were conducted virtually, were billable under Akoben's contract with the school.[58]

Effective July 1, 2022, Akoben terminated Dr. Brown.[59] There is significant unrebutted evidence in the record to support that Akoben was in severe financial distress at the time.[60] Akoben contends that the termination was based upon a reduction in force because Akoben had been consistently losing money and was on the verge of bankruptcy.[61] Evidence of record further supports that Akoben terminated another employee close in time to when it terminated Dr. Brown, and then another later that year.[62]

---

[53] D.I. 82, Ex. 11 at ¶¶ 8, 13.
[54] D.I. 82, Ex. 6 at 318:15-19.
[55] *Id.* at 321:20-322:3.
[56] *Id.* at 334:19-22.
[57] D.I. 82, Ex. 11 at ¶ 11.
[58] *Id.* at ¶¶ 13-14.
[59] D.I. 82, Ex. 1 at ¶ 26 ("As a result, I made the decision to separate Plaintiff from Akoben, pursuant to its reduction in force, effective July 1, 2022.").
[60] D.I. 82, Ex. 10; *id.*, Ex. 11 at ¶ 2; *id.*, Ex. 1 at ¶ 24.
[61] D.I. 81-3 at 5.
[62] *See* D.I. 82, Ex. 1 at ¶¶ 27 (Dr. Muhammad asserting by affidavit that Isaiah Agwu was terminated under the reduction in force at the same time as Dr. Brown and that Bilphena Yahwon was terminated in December 2022); *see also id.*, Ex. 11 at ¶ 18 (Mr. Korr asserting the same).

Dr. Brown filed her initial complaint in the Superior Court in February 2024. In it, she named TLI and Dr. Muhammad as defendants.[63] She then amended her complaint by removing Dr. Muhammad as a party and designating TLI and Akoben as the two defendants.[64] She then filed a seconded amended complaint which addressed formatting errors.[65] Dr. Brown, through the course of discovery, filed multiple documentary exhibits with the Court.[66] The Court considers those efiled documents to be part of the summary judgment record and has fully considered them, over the Companies' objections, even though Dr. Brown did not include them with her answering brief.

The Companies now move for summary judgment. The Court held oral argument on December 5, 2025.[67] The Court permitted the parties to file additional argument in letter form after reserving its decision.[68] This Opinion provides the reserved decision.

## II.    ARGUMENTS OF THE PARTIES

TLI first argues that it cannot be liable under the DDEA because it was never Dr. Brown's "employer" as that term is used in the DDEA.[69] With the support of affidavits and other documents, TLI contends that Akoben maintained full control over Dr. Brown's work throughout her employment.[70] While TLI acknowledges that its personnel could assign tasks to Dr. Brown, it contends it did so only in its capacity as a separate business.[71]

---

[63] D.I. 1.
[64] D.I. 29.
[65] D.I. 33.
[66] D.I. 29, Exs. 1-9; D.I. 37, Exs. 10-25; D.I. 41, Exs. 26-30.
[67] D.I. 85.
[68] *Id.*
[69] D.I. 81-3 at 6-9.
[70] D.I. 82, Ex. 1 at ¶ 9.
[71] *Id.* at ¶ 10.

In response, Dr. Brown emphasizes the following facts of record relevant to TLI's status for purposes of the DDEA: (1) her W-2 forms listed TLI as her employer at all relevant times, (2) she worked in a joint TLI and Akoben office and was given a TLI email address, and (3) TLI employees supervised her closely.[72] She argues that these circumstances create a triable issue of fact regarding TLI's status as a joint employer for purposes of her DDEA claims.

Next, turning to the merits of Dr. Brown's DDEA claims, the Companies first collectively challenge the sufficiency of her claim that they discriminated against her by rejecting her for the new position because she is female. The Companies contend that the record is devoid of facts supporting that gender had anything to do with the decision. Rather, they contend that the new position was "hers to lose," but she performed poorly in the interview and acted confrontationally.[73] As an alleged result, the interviewers chose not to select her.[74]

Dr. Brown counters only with argument that they denied her the new position because of her gender.[75] She identifies no facts, however, to support such an inference.

Separately, the Companies seek summary judgment regarding her hostile work environment claim under the DDEA. They contend that the complained-of conduct could not be considered severe or pervasive by any reasonable jury. Furthermore, the Companies contend that there are no facts of record to demonstrate that the conduct she identifies was motivated in any way by her gender.

Dr. Brown counters on the issue of a hostile work environment by arguing that Dr. McAllister's consistent use of her first name rather than her title, her exclusion

---

[72] D.I. 83 at 11-12.

[73] D.I. 82, Ex. 1 at ¶ 15.

[74] *Id.* at ¶ 17.

[75] She alternatively contends, in her third DDEA claim, that they denied her the position in retaliation for her *complaints* regarding gender discrimination.

11

from meetings, gendered work assignments, and exclusion from leadership opportunities amounted to a "sustained pattern of marginalization" that cannot be cast aside as "episodic" events.[76] To this end, she emphasizes that her hostile work environment claim must be evaluated under the totality of the circumstances.[77]

The Companies also seek summary judgment regarding her third DDEA claim – where she alleges retaliation because they did not select her for the new position. At the outset, they contend that they could not have retaliated under the DDEA because she reported nothing about gender. At most, they allege, she reported ill-defined rude and unprofessional treatment. The Companies further emphasize what they contend to be the reason for not offering her the new position – poor performance in the interview.

On the claim for retaliation under the DDEA, Dr. Brown argues that her complaint to human resources reported gender-based discrimination. But, she cites no facts of record—beyond mere argument—to support her claim that she reported gender as a motivating factor for the mistreatment.[78] She further contends she made the complaint to Ms. Harris somewhere around April 2022,[79] and the TLI panel interview occurred on April 5, 2022.[80] Dr. Brown asserts that this demonstrates a temporal proximity between her complaint and her rejection sufficient to support an inference of retaliatory motive.[81]

---

[76] D.I. 83 at 13.

[77] *Id.* (first citing *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); and then citing *Oncale v. Sundowner Servs.*, 523 U.S. 75, 80-81 (1998)).

[78] *Id.* at 13-14.

[79] D.I. 82, Ex. 6 at 193:3-9. There is no evidence of record regarding such complaints in the summary judgment record other than Dr. Brown's testimony. Nowhere does she fix the date of the alleged complaints as being before, or after, the April 5th panel interview or the decision to not award her the position.

[80] *Id.* at 263:2-6.

[81] D.I. 83 at 14 (citing *Gary v. R.C. Fabricators Inc.*, 2014 WL 4181479, at *24-25 (Del. Super. July 30, 2014)).

Finally, Akoben moves for summary judgment regarding Dr. Brown's DWPA claim. In support, Akoben focuses on the definition of "violation" in the DWPA which is a trigger for potential DWPA liability. According to Akoben, Dr. Brown never identified any statute or regulation that she believed Mr. Korr had violated when she made her report. Akoben further contends that no facts support that it violated any statute, rule, regulation, or policy of the company. In other words, they allege there was no violation in fact. Finally, Akoben submits a significant quantum of likely admissible evidence to support a non-discriminatory reason for terminating her – a reduction in force due to dire business concerns.

Dr. Brown, for her part, identifies, for the first time in her briefing, a statute that she contends Mr. Korr's instructions violated – the federal False Claims Act.[82] That, she contends, qualifies as a violation, which satisfies her burden on summary judgment to trigger potential DWPA liability. She further contends that Akoben's reliance on a reduction in force to terminate her was pretextual.

## III. STANDARDS

Summary judgment is appropriate when the record demonstrates no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[83] A fact is material if it would change the outcome of the case.[84] The initial burden falls on the moving party to show that there are no material disputes of fact.[85] If the moving party makes that showing, the burden shifts to the non-moving party to identify some material fact in dispute.[86]

---

[82] 31 U.S.C. § 3729(a)(1).
[83] Super. Ct. Civ. R. 56(c).
[84] *Radulski v. Liberty Mut. Fire Ins. Co.*, 2020 WL 8676027, at *3 n.27 (Del. Super. Oct. 28, 2020).
[85] *Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del. 1995).
[86] *Id.*

13

Turning to the standard applicable to Dr. Brown's DDEA claims, Delaware courts apply the *McDonnell-Douglas*[87] burden shifting framework to evaluate workplace discrimination claims in the absence of any direct evidence of discrimination.[88]  Under this framework, the plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence.[89]  If successful, the burden shifts to the defendant to articulate "a legitimate, nondiscriminatory reason for the adverse employment decision."[90]  If the defendant meets that burden, the burden shifts back to the plaintiff to show that the defendant's "proffered reasons are mere pretexts designed to cover discriminatory motives."[91]  To make a pretextual showing, the plaintiff must demonstrate that a reasonable factfinder could either (1) disbelieve the defendant's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of defendant's action.[92]

As to the DWPA, that Act prohibits an employer from discharging or otherwise discriminating against an employee for reporting a "violation" to the employer which he or she "knows or reasonably believes has occurred or is about to occur."[93]  Relevant to Dr. Brown's claim, the statute defines a "violation" as "an act or omission by an employer . . . that is . . . [m]aterially inconsistent with, and a serious deviation from, standards implemented pursuant to *a law, rule, or regulation*

---

[87] *McDonnell-Douglas v. Green*, 411 U.S. 792, 802-03 (1973).
[88] *See Giles v. Fam. Ct. of Del.*, 411 A.2d 599, 601-02 (Del. 1980) ("While the *McDonnell Douglas* test was developed in the context of Title VII cases, in our view it is appropriate for a § 711(a) action as well, because the language of the Delaware statute is substantially the same as the Title VII language defining an unlawful employment practice.").
[89] *Wagenhoffer v. Visionquest Nat'l Ltd.*, 2016 WL 3947952, at *4 (Del. Super. July 14, 2016).
[90] *Id.*
[91] *Id.*
[92] *Id.* at *6.
[93] 19 *Del. C.* §§ 1703(1), (4).

14

promulgated under the laws of this State, or the United States . . . ."[94]  At trial, the plaintiff bears the burden of establishing that they engaged in a protected activity that was the primary motivator for the retaliatory action.[95]

## IV.   DISCUSSION

The Court will first address Dr. Brown's DDEA claims.  Then, it will examine her DWPA claim.

### A.  DR. BROWN'S DDEA CLAIMS

Delaware's discrimination in employment law, the DDEA, is found in Subchapter II, of Chapter 7, of Tile 19 of the Delaware Code.  The Delaware Supreme Court has interpreted the DDEA consistently with Title VII of the Civil Rights Act of 1964 because of its parallel provisions.[96]  Accordingly, Delaware courts have followed suit by consistently relying on federal precedent that interprets Title VII when interpreting the DDEA.[97]   In its broadest sense, the DDEA protects employees—as does Title VII—against employers who "[f]ail or refuse to hire or to discharge any individual or otherwise . . . discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's . . .  gender identity . . . ."[98]

Dr. Brown's DDEA claims are segregated into claims related to three employment practices prohibited by the DDEA.  When examining them, the Court interprets the DDEA broadly to protect against different types of discrimination.[99] To that end, the plain meaning of the statute protects against discrimination based on

---

[94] *Id.* § 1702(6) (emphasis added).
[95] *Id.* § 1708.
[96] *See Riner v. Nat'l Cash Reg.*, 434 A.2d 375, 376 (Del. 1981).
[97] *See id.* (recognizing that Delaware courts take the "interpretive lead from federal decisions construing and applying Title VII of the Civil Rights Act of 1964").
[98] 19 *Del. C.* § 711(b)(1).
[99] *See* Am. Jur. 2d *Job Discrimination* §§ 805-807 (outlining different types of workplace discrimination claims).

15

a protected characteristic.[100]   Relevant to Dr. Brown's claims, the United States Supreme Court has held, in the Title VII context, that employers may not treat their employees worse than other similarly situated employees because of their gender.[101]

As to Dr. Brown's first claim under the DDEA, the United States Supreme Court has recognized that the "terms, conditions, or privileges of employment" is an expansive concept that includes economic benefits and less tangible benefits such as titles and promotional opportunities.[102]   Dr. Brown contends that the Companies jointly discriminated against her by refusing to award her the new position with TLI. Even though Dr. Brown was to receive no increase in pay with the new position, further review of this claim is appropriate because it involved, at a minimum, a new title.  As discussed below, however, the facts of record fail to support an inference that her rejection was gender motivated.

As to her second claim, the DDEA provides a remedy for employees whose work environments become so saturated with discriminatory harassment that it alters an employee's conditions of employment – making it a hostile work environment.[103] The DDEA protects against such an environment because it is considered a "term or condition" of employment.[104] One of the elements for this claim is that such harassment must be severe or pervasive.   In this case, Dr. Brown identifies no facts that demonstrate that the Companies, or their employees, engaged in severe or

---

[100] 42 U.S.C. § 2000e-2(a).

[101] *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020) (holding that Title VII's prohibition on "sex" discrimination in the context of discrimination against gay and transgender employees).

[102] *See Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024) (rejecting a "significant" harm requirement to establish that a job transfer constitutes an adverse employment action under Title VII).

[103] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (holding that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment").

[104] *See Crockett v. Mission Hosp., Inc.*, 717 F.3d 348, 354 (4th Cir. 2013) ("Because 'an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action.'").

16

pervasive misconduct. Another element of a hostile work environment claim requires that the treatment be motived by gender. Here, the record also contains no facts to support that inference.

In Dr. Brown's third DDEA claim, she alleges that she reported gender discrimination, and that the Companies retaliated against her by denying her the new position with TLI because of that complaint. The DDEA protects employees from retaliation when they report discrimination.[105] The DDEA's antiretaliation provision advances the goals of the DDEA's antidiscrimination provisions "by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees."[106] In this way, the DDEA's antidiscrimination and antiretaliation provisions work together. The antidiscrimination provisions supply the substantive protections, and the antiretaliation provision ensures that employees can access those protections. Here, for the reasons to follow, Dr. Brown fails to identify facts to support that she either reported gender discrimination or the existence of a causal link between the report and the rejection.

1. **The record demonstrates a factual issue regarding whether TLI and Akoben jointly employed Dr. Brown.**

The DDEA covers several unlawful employment practices. Among them is a prohibition against *an employer* discriminating against an employee in a way that interferes with a condition of employment.[107] Dr. Brown's three DDEA claims focus in significant part on the alleged conduct of Dr. McAllister, a TLI director. Because

---

[105] *See* 19 *Del. C.* § 711(g) (prohibiting retaliation against an employee "because such person has opposed any practice prohibited by this subchapter"); *see also* 42 U.S.C. § 2000e-3(a) (prohibiting retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter").

[106] *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (holding that actionable retaliation under Title VII need not be related to terms and conditions of employment).

[107] 19 *Del. C.* § 711(b).

she centers many of her claims on Dr. McAllister, TLI's status as a joint employer becomes a material issue for purposes of summary judgment.

Federal courts have consistently recognized that two employers may jointly employee a plaintiff for purposes of Title VII.[108] Federal case law uniformly focuses on who controlled the worker and apply a litany of factors to engage in what is a factually intensive inquiry.[109] The United States Court of Appeals for the Third Circuit has explained that a joint employer relationship arises when "two entities exercise significant control over the same employees."[110] In determining whether there is such a relationship, the Third Circuit weighs the following factors to evaluate who controls the employee: (1) whether the entity has the authority to hire and fire the employee, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; (2) whether the entity performs day-to-day supervision of the employee, including administering employee discipline; and (3) whether the entity has control of the employee's records, including payroll, insurance, taxes and the like.[111]

---

[108] *See, e.g.*, *Graves v. Lowery*, 117 F.3d 723, 727 (3d Cir. 1997); *Bourne v. V.C. Enter./Kirby Home Cleaning Sys.*, 157 F. Supp. 3d 372, 378 (D. Del. 2016).

[109] *See, e.g.*, *EEOC v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013) (applying a "control" test); *see also Butler v. Drive Automotive Industries of Am., Inc.*, 793 F.3d 404, 414 (4th Cir. 2015) (applying a "hybrid" test); *Felder v. U.S. Tennis Ass'n*, 27 F.4th 834, 843 (2d Cir. 2022) (applying the common-law agency test to a discrimination claim).

[110] *Graves*, 117 F.3d at 727. Similarly, controlling Delaware law looks to many of the same factors when determining employment status.

[111] *Plaso v. IJKG, LLC*, 553 F. App'x 199, 204 (3d Cir. 2014); *Bourne*, 157 F. Supp. 3d at 378-79. Other Circuits, such as the Second Circuit, apply the factors found in Section 220 of the Restatement (Second) of Torts which on their face, apply only to agency determinations for purposes of respondeat superior liability. *See Felder*, 27 F.4th at 843. Delaware applies Section 220 for questions of agency. *See Acree v. Bayhealth Med. Ctr.*, 2023 WL 2700208, at *5-8 (Del. Super. March 29, 2023) (citing *Fisher v. Townsends, Inc.*, 695 A.2d 53, 61 (Del. 1997)). Under *Fisher v. Townsends, Inc.*, the principal-agent inquiry focuses on the following non-exclusive factors: (a) the extent of control, which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skill required in the

As when determining agency for the purpose of *respondeat superior* liability, questions of employment status under Title VII and the DDEA are generally questions of fact.[112] On this issue, TLI relies, in part, on the Companies' shared services agreement which recites that the employees of one should not be considered employees of the other.[113] Agreements between two potential joint employers are not dispositive regarding the issue of joint employment, however. Although TLI and Akoben's contractual definition of their roles may be a relevant factor, it does not provide a litmus test for this discrimination claim any more than it would singularly resolve a question of agency.[114]

Here, TLI meets its initial burden on summary judgment. It submits affidavits attesting that Dr. Brown was employed only by Akoben, that Akoben controlled the manner and method of Dr. Brown's work, and that TLI and Akoben's contract made

---

particular occupation; (e) whether the employer or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is a part of the regular business of the employer; (i) whether or not the parties believe they are creating the relation of master and servant; and (j) whether the principal is or is not in business. *Fisher*, 695 A.2d at 59. The common thread through these factors is that they all focus on the alleged employer's control over the plaintiff employee. The Third Circuit's test in *Plaso* has significant overlap with these factors. In this case, whichever test is applied, there remains a dispute of material fact regarding whether TLI employed Dr. Brown for purposes of the DDEA.

[112] *See Graves*, 117 F.3d at 729 ("In sum, the precise contours of an employment relationship can only be established by a careful factual inquiry."); *cf. Acree*, 2023 WL 2700208, at *6 (recognizing that determinations of principal/agent and employer/employee relationships are generally inappropriate to decide on summary judgment (citing *Fisher*, 695 A.2d at 59)). As will be explained below, the employment test in the context of discrimination suits completely track the test used for employment for discrimination cases in some federal jurisdictions and nearly parallel it others.

[113] *See* D.I. 82, Ex. 1 at ¶ 3 ("There is a Shared Services Agreement for Corporate Services between TLI and Akoben expressly providing that 'for such time as any employees or independent contractors of Service Provider are providing the Services to Service Recipient under the Agreement (a) such employees will remain employees of Service Provider . . . .'").

[114] *See Acree*, 2023 WL 2700208, at *5 (confirming, as held in *Fisher*, that even though two parties may contractually define one as a master and one as a servant for purposes of vicarious liability, the question remains almost entirely one of fact based on actual exercise of control.).

Dr. Brown an employee of Akoben. Accordingly, this showing shifts the burden to Dr. Brown to demonstrate a material issue of fact.

Dr. Brown, in turn, demonstrates an issue of fact based upon an application of the aforementioned Third Circuit factors. As to the first Third Circuit factor, Dr. Brown received a TLI offer letter for employment and accepted it.[115] There is no indication on the record (1) that TLI rescinded the offer, or (2) that she revoked her acceptance. Furthermore, Ms. Harris, the human resource manager for both TLI and Akoben, sent her the termination letter at the end of her employment.[116] Tellingly, that notice of termination came from a TLI email address.[117]

As to the second factor, Dr. McAllister, who was the Director of Operations at TLI, took an active role in overseeing and managing Dr. Brown's work. The facts support an inference that he managed her more closely than what would be expected from a client interacting with an independent contractor's employee. Again, Dr. McAllister required Dr. Brown to copy him on all emails that she sent,[118] which further supports an inference of control and supervision by TLI.

As to the third factor, Dr. Brown's W-2 forms listed "Transforming Lives Inc." as her employer.[119] This fact alone provides sufficient likely admissible evidence for a reasonable jury to weigh heavily against TLI on the joint employer issue. Applying the three Third Circuit factors highlight a factual dispute that cannot be resolved on summary judgment.

---

[115] D.I. 82, Ex. 1 at ¶ 7; Ex. 6 at 79:21-80:5.
[116] D.I. 41, Ex. 29.
[117] *Id.*
[118] D.I. 82, Ex. 6 at 277:19-278:14.
[119] D.I. 29, Ex. 1.

**2. The Companies are entitled to summary judgment regarding Dr. Brown's first gender discrimination claim on an alternative basis, however.**

Dr. Brown asserts a gender discrimination claim under the DDEA because the Companies did not award her the new position. Specifically, she contends that TLI did not because she was a woman. For this claim, she seeks to apply the same test used to evaluate an allegedly discriminatory denial of a promotion even though there remains an issue of fact regarding whether the new position would qualify as a promotion.

To state a prima facie case of gender discrimination for denial of a promotion under the DDEA, a plaintiff must show that (1) she belonged to a protected class, (2) she was qualified for the position, (3) she was not hired, and (4) the circumstances surrounding the decision give rise to an inference of illegal discriminatory motive.[120] The Companies contend that Dr. Brown's claim fails on summary judgment for two reasons: because such a claim is only available for promotions and the new position would have been a lateral move, and because there are no facts to support an inference of a discriminatory motive for rejecting her. This second contention centers on the fourth element—discriminatory motive—which is dispositive.

The element of discriminatory motive is best considered a causation requirement. It stems from the "because of" language found in the DDEA as is also found in Title VII's parallel provision.[121] To satisfy the element, a plaintiff must show that her employer discriminated against her *because of* a protected characteristic. More particularly, the plaintiff must demonstrate that the protected

---

[120] 19 *Del. C.* § 711(b)(1); *Wagenhoffer*, 2016 WL 3947952, at *4.

[121] *Compare* 19 *Del. C.* § 711(b)(1) (prohibiting discrimination against an employee "because of such individual's race, marital status, genetic information, color, age, religion, sex (including pregnancy), sexual orientation, gender identity, national origin, military status, or housing status"), *with* 42 U.S.C. § 2000e-2(a)(1) (prohibiting discrimination against an employee "because of such individual's race, color, religion, sex, or national origin").

characteristic—in this case gender—was a "motivating factor" in the employer's decision.[122]

At the outset, the Companies identify significant facts, through affidavits and Dr. Brown's text admissions, to support their decision to pass her over for the new position because of her poor interview performance. In that way, they meet their initial burden on summary judgment. As a result, the burden shifts to Dr. Brown to demonstrate a material issue of fact regarding discriminatory motive. On this record, Dr. Brown identifies no facts to support this element. That is, facts are absent to support that gender had any role in motivating TLI to not hire her for the new position.

At the outset, the three-person interview panel for the position agreed that her interview performance—described as agitated and combative—motivated TLI to withhold the offer.[123] Dr. Brown, for her part, texted one of the interviewers to apologize for her performance afterward. There, she wrote: "I'm sorry for making you feel uncomfortable during yesterday's interview. I know I didn't show up as my best self."[124] Moreover, throughout Dr. Brown's deposition testimony, she consistently maintained that *she could not ascribe intent to anyone's actions* other than by applying "speculation."[125] For instance, she candidly admitted that she had no knowledge regarding why Dr. McAllister, who was the head of the interview

---

[122] *See E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773-74 (2015) ("If the applicant actually requires an accommodation of that religious practice, and the employer's desire to avoid the prospective accommodation is a motivating factor in his decision, the employer violates Title VII.").

[123] D.I. 82, Ex. 8 at ¶ 5 (affidavit of Patricia Glasco); *id.* at ¶ 4 (affidavit of William Fuller).

[124] D.I. 82, Ex. 9.

[125] D.I. 82, Ex. 6 at 143:10-12 (referring to Dr. Muhammad's "I need a woman" statement, "I didn't know what it meant. I still don't know what it meant, but he said that as well"); *id.* at 153:2-4 (Q: "So it's your speculation that [Mr. Miller] did this because of your gender?" A: "Yes."); *id.* at 171:13-18 ("No, I can't tell you because I stated many times, I will never be able tell you why Dr. McAllister does and says what he does what he does and says. I can just tell you what happened and how it sounded and how it made me feel at the time.").

panel, "does and says what he does and says."[126]  Furthermore, she identifies no comparator evidence to support an inference that the Companies passed over her for the TLI position *because of* her gender. [127]  The Court's decision must rest on the summary judgment record and not upon mere argument.  Here, Dr. Brown identifies no facts to support her burden on summary judgment regarding this necessary element.

On balance, when giving Dr. Brown the deference due on summary judgment, the record contains no likely admissible evidence to support an inference that gender was a motivating factor in denying her the position.  To the contrary, the facts overwhelmingly demonstrate a legitimate non-discriminatory reason for the decision.

### 3. The Companies are also entitled to summary judgment regarding Dr. Brown's hostile work environment claim.

Dr. Brown's second discrimination claim under the DDEA is for a hostile work environment.   To state a prima facie case for a hostile work environment motivated by gender, a plaintiff must prove at trial that she (1) suffered intentional discrimination because of her sex, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected her, (4) the discrimination would detrimentally affect a reasonable person of the same sex in the same position, and (5) the presence of *respondeat superior* liability.[128]  Courts consider the totality of the circumstances when evaluating these factors which include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or

---

[126] *Id.* at 171:14-16; *see also* D.I. 82, Ex. 9 (Dr. Brown acknowledging by text to Mr. Fuller that she did not perform well during her interview).

[127] *See Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 n.2 (3d Cir. 2010) (noting that an inference of discrimination can be raised "in a number of ways, including, but not limited to, comparator evidence [or] evidence of similar racial discrimination of other employees").

[128] *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009); *see also Miller v. State, Dept. of Public Safety*, 2011 WL 1312286, at *9 (Del. Super April 6, 2011) (same).

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[129]

The DDEA, like Title VII, was never intended to be a "general civility code."[130] In one sense, four of the five elements in the claim confirm this characterization. For instance, one of the elements, the "severe or pervasive" element, requires the hostile work environment to be so severe or pervasive that it alters the "terms and conditions of employment."[131] Isolated incidents generally will not meet this standard unless they are particularly severe.[132] Another element differentiating this from a general civility code is the "because of" element. It requires a plaintiff to establish that the hostile treatment was motivated by the plaintiff's protected characteristic – here, Dr. Brown's gender.

An absence of facts to support these two elements is dispositive in this case. Namely, Dr. Brown's hostile work environment claim fails on summary judgment for two reasons: (1) no reasonable jury could find that these isolated incidents were severe or pervasive, and (2) no facts support an inference linking the unprofessional conduct to her gender.

First, as to severity and pervasiveness, she contends that Dr. McAllister's frequent use of her first name contributed to a hostile work environment.[133] Office norms often influence the names and titles that are used in the workplace. In this case, the record reveals that persons in her office frequently used casual titles to refer

---

[129] *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998); *see also Harris*, 510 U.S. at 23 (same).
[130] *Oncale*, 523 U.S. at 80 (discussing Title VII).
[131] *Faragher*, 524 U.S. at 788.
[132] *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005); *see also Honey v. Dover Downs, Inc.*, 2021 WL 6197082, at *5 (D. Del. Dec. 9, 2021) (recognizing that "one severe incident may be enough to create a hostile work environment").
[133] *See Busby v. Kramer*, 22 F. App'x 758, 759-60 (9th Cir. 2001) (holding that supervisor's use of nicknames like "girlie" for female workers was not actionable under Title VII).

to peers.[134] In contrast, the record includes only one instance when Dr. McAllister referred to Dr. Brown as "Erika" in front of a client.[135] The balance of the witnesses to that alleged conduct were other doctorate employees who were her peers and coworkers.[136] The use of first names among peers, and one instance of informality in front of a client, do not contribute to a hostile work environment under the DDEA.

Furthermore, the balance of the incidents that Dr. Brown describes were not sufficiently severe or pervasive when considered in their totality. Namely, Dr. Muhammad's single comment in her initial interview that he "need[s] a woman"— after which he hired her—is neither severe nor pervasive. Likewise, Dr. McAllister's suggestion that the name of the new TLI position should be changed to "Director of Teaching and Learning" does not lend itself to a reasonable inference of severity or pervasiveness. Furthermore, Dr. McAllister's single request that Dr. Brown make copies was just that, a single incident. Finally, the incident with her co-worker Suleiman Miller, who allegedly blocked her from entering a school while growling at her based upon some type of disagreement, was a single disjointed incident that Dr. Muhammad addressed with Mr. Miller.[137]

The sum of these incidents, occurring over greater than a year of employment, could not justify a jury inference that she was subjected to severe or pervasive harassment. Accordingly, summary judgment is appropriate on her hostile work environment claim because Dr. Brown demonstrate no issue of fact regarding this necessary element.

Second, summary judgment is independently appropriate because the record provides no tenable inference as to causation, beyond speculation. For the most part,

---

[134] *E.g.*, D.I. 82, Ex. 6 at 174:4-21; *id.* at 176:8-177:7.
[135] *Id.* at 180:4-12.
[136] *Id.* at 135:3-8, 181:12-182:5.
[137] *Id.* at 153:6-154:1; *id.* at 150:22-151:3.

the incidents she describes do not bear a clear relationship to her gender. Only Dr. McAllister's single request that Dr. Brown make copies could be inferred to be a female-coded work assignment which, if pervasive, could tally in support of an inference of gender discrimination. But, again, that was a one-off incident and Dr. McAllister supervised Dr. Brown – at least Dr. Brown alleges that he supervised her because TLI jointly employed her. A supervisor's single request that a subordinate make copies does not support an inference of gender-based motivation.

Similarly, Dr. Muhammad's comment that "I need a woman" during Dr. Brown's initial interview is too vague of a statement from which to infer discriminatory motive. If anything, such a statement cuts favorably regarding gender motivation, not adversely, since Dr. Muhammad hired her. Finally, the other incidents she identifies have no apparent relationship to gender. As Dr. Brown conceded in her deposition testimony, she could not ascribe any particular motive to anyone other than through speculation.[138] Once again, allegedly rude treatment in the workplace, untethered to any protected characteristic, is insufficient.

In summary, when the circumstances are considered in their entirety, Dr. Brown fails to identify facts that support severe or pervasive harassment. Nor does she identify facts to support an inference that her gender was the motivating factor for any allegedly unprofessional treatment. For these two reasons, summary judgment on behalf of the Companies regarding her hostile work environment claim is appropriate.

---

[138] *Id.* at 152:23-151:3 ("I don't have proof because I don't have reasons for treating me that way."); *id.* at 143:10-12 (referring to Dr. Muhammad's "I need a woman" statement, "I didn't know what it meant. I still don't know what it meant, but he said that as well"); *id.* at 153:2-4 (Q: "So it's your speculation that [Mr. Miller] did this because of your gender?" A: "Yes."); *id.* at 164:1-8 ("I can't prove as to why. I will never have any proof of [Dr. McAllister's] reason for asking me to make copies. I can only tell you what I speculate and regarding how he made me feel and looked and sounded at the time."); *id.* at 171:13-18 ("No, I can't tell you because I stated many times, I will never be able tell you why Dr. McAllister does and says what he does what he does and says."); *id.* at 184:14-15 ("I don't know [Dr. McAllister's] reason for addressing me as [Erika].").

### 4. Dr. Brown's retaliation claim under the DDEA also does not survive summary judgment.

In Dr. Brown's third DDEA claim, she claims that the Companies denied her the new position with TLI because she reported gender discrimination. The Court has already addressed why the record does not support that her gender motivated the rejection. In this claim, she contends alternatively that *her complaint* regarding gender discrimination was the impetus for being rejected for the new position.

To succeed in a claim for retaliation under the DDEA, a plaintiff must show that (1) she engaged in activity protected by the DDEA, (2) her employer took an adverse action against her, and (3) there was a causal connection between the protected activity and the adverse action.[139] Reporting a DDEA violation constitutes protected activity.[140] However, a report "must identify the employer and the practice—if not specifically, at least by context."[141] Germanely, a general complaint about unfair treatment does not constitute protected activity for purposes of a DDEA retaliation claim.[142]

---

[139] *Wagenhoffer*, 2016 WL 3947952, at *7.

[140] 19 *Del. C.* § 711(g).

[141] *See Slagle v. Cnty. of Clarion,* 435 F.3d 262, 268 (3d Cir. 2006) (holding that plaintiff's "vague allegations of 'civil rights' violations," without reference to discrimination based on any protected category, did not constitute protected conduct under Title VII); *see also Curay-Cramer v. Ursuline Acad. of Wilm., Del., Inc.*, 450 F.3d 130, 134 (3d Cir. 2006) ("We conclude that Curay–Cramer did not engage in protected activity when she signed a pro-choice advertisement that did not mention employment, employers, pregnancy discrimination, or even gender discrimination.").

[142] *See Curay-Cramer*, 450 F.3d at 135 ("First, case law has established that opposition to an illegal employment practice must identify the employer and the practice—if not specifically, at least by context."); *Slagle*, 435 F.3d at 268 (holding that filing of a facially invalid EEOC complaint does not constitute "protected activity"); *see also Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 195 (3d Cir. 2015) (holding that plaintiff failed to establish that one of her complaints constituted protected activity because she "fail[ed] to demonstrate that she related her complaints to age or race discrimination such that the complaints could have qualified as protected activity under the anti-discrimination statutes").

Dr. Brown contends that she engaged in protected activity when she complained about mistreatment by Dr. McAllister and Mr. Miller. She further contends that she satisfies the causal element for summary judgment purposes because of the temporal proximity between the time of her report and when the Companies passed over her for the new position.[143]

For two separate reasons, her DDEA retaliation claim does not survive summary judgment. First, although reporting a DDEA violation constitutes protected activity,[144] the result here turns on whether Dr. Brown's report alleged *gender discrimination* as opposed to unprofessional treatment. While the Companies contest that she made *any* complaint to human resources, for purposes of summary judgment, the Court assumes that she did. The record, read in the light most favorable to Dr. Brown, includes only her testimony describing a report complaining of unprofessional treatment, which her testimony leaves untethered to gender. More particularly, she described her report to Ms. Harris as follows: "I told her that the way that I felt when I was brought into this organization, something has changed, and it has everything to do with [Dr. McAllister]. I felt I was targeted, mistreated, disregarded."[145] No other evidence in the summary judgment record touches on her alleged report. Moreover, Dr. Brown candidly testified that she *has no basis to opine* why Dr. McAllister allegedly did what she complained about.[146] This single report, untethered to gender discrimination, fails to support an inference that she engaged in protected activity.

Second, Dr. Brown identifies no facts to support a causal connection between her alleged complaint and the rejection. To satisfy this element on summary

---

[143] D.I. 83 at 14 (citing *Gary*, 2014 WL 4181479, at *24-25).
[144] 19 *Del. C.* § 711(g).
[145] D.I. 82, Ex. 6 at 156:15-19.
[146] *Id.* at 171:13-18 ("No, I can't tell you because I stated many times, I will never be able tell you why Dr. McAllister does and says what he does what he does and says.").

judgment, Dr. Brown "may show a close temporal proximity between the protected activity and the alleged retaliatory conduct, or by submitting 'circumstantial evidence . . . that gives rise to an inference of causation.'"[147] In this case, she relies on only an allegedly close temporal proximity between what she alleges to be her report and the retaliatory conduct.

On this record, a singular reliance on temporal proximity is insufficient because the sequence between the alleged complaint and the alleged retaliation is unclear. Namely, Dr. Brown testified repeatedly that she could not recall when she made the complaint, and then only later narrowed her estimate to sometime "around" April 2022.[148] She undisputedly interviewed for the position on April 5, 2022.[149] These facts leave only speculation regarding the sequence between her alleged complaint and her rejection. For that reason, no jury could reasonably infer that made the report before the Companies rejected her for the new position.

In summary, Dr. Brown fails to identify facts in the record to support two necessary elements of her DDEA retaliation claim: that she engaged in protected activity, and that a causal link existed between her report and the Companies' decision to pass her over for the newly created position.

## B. DR. BROWN'S DWPA CLAIM

Finally, Dr. Brown asserts a separate statutory basis of retaliation under the DWPA. In this case, she alleges that Akoben retaliated against her because she accused Mr. Korr of advocating billing fraud.

The DWPA protects employees who report a violation of a law enacted for the public's benefit from retaliation.[150] At a high statutory level, the DWPA prohibits an

---

[147] *Miller v. State, Dept. of Public Safety*, 2011 WL 1312286, at *9 (quoting *Marra. v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007)).
[148] D.I. 82, Ex. 6 at 155:18-21.
[149] *Id.* at 270:11-14.
[150] *Smith v. Del. State Univ.*, 47 A.3d 472, 476 (Del. 2012).

employer from terminating or taking adverse action against an employee who reports a "violation" that the employee "knows or reasonably believes has occurred or is about to occur[.]"[151]

More particularly, the DWPA includes a specific definition of "violation." It defines it as an act or omission that is:

> [m]aterially inconsistent with, and a serious deviation from, financial management or accounting standards implemented pursuant to a rule or regulation promulgated by the employer or a law, rule, or regulation promulgated under the laws of this State, a political subdivision of this State, or the United States, to protect any person from fraud, deceit, or misappropriation of public or private funds or assets under the control of the employer.[152]

Elsewhere, the DWPA provides a cause of action against retaliation for an employee who reports a violation or a reasonable belief about a violation.[153]

Dr. Brown contends that Mr. Korr directed her to commit fraud when he met with her and two other Akoben employees to urge them to bill for emails, phone calls, and client site visits. As a result, she reported that Mr. Korr advocated fraud but identified no statute or regulation that he allegedly violated. In her briefing, however, she now contends that his request violated the federal False Claims Act (the "FCA"). [154]

The FCA prohibits presenting fraudulent claims to a federal agency.[155] For purposes of this decision, the Court will assume, without holding, that if Akoben made a false claim to a Maryland school district that accepts federal funding, there

---

[151] 19 *Del. C.* § 1703(4).
[152] 19 *Del. C.* § 1702(6)(b); *see also Fender v. Del. Div. of Revenue*, 628 F. App'x 95, 98 (3d Cir. 2015) (holding that gender discrimination does not constitute a "violation" under the DWPA).
[153] 19 *Del. C.* § 1703(4).
[154] 31 U.S.C. § 3730(h).
[155] *Id.* § 3729(a)(1).

may be a FCA violation.[156]  Given that assumption, the Court turns to the language of the DWPA to examine the parties arguments regarding a possible ambiguity.

To be sure, two different readings advocated by the parties are *possible*.  On one hand, the DWPA could be read to require that the complained of conduct must involve an actual violation of a *written policy, law, rule, or regulation* to fall within the definition of "violation" in 19 *Del. C.* § 1702(b).[157]  Persuasive authority in the Superior Court has adopted this reading—that is, one requiring a plaintiff to identify a specific law, rule, or regulation that *was actually violated* to survive summary judgment.[158]  On the other hand, the DWPA's reference in 19 *Del. C.* § 1703(4) to a "reasonable belief" could be read to permit a showing that an employee must merely "reasonably believe" that some law, rule, or regulation was violated at the time of the initial report.[159]  That interpretation could excuse Dr. Brown from proving an actual violation as an element of her claim.

Here, the Court need not declare an ambiguity to resolve this dispute because summary judgment is appropriate under either reading.  Namely, the record contains no facts to support that Mr. Korr's request either (1) constituted a violation, or (2) could have reasonably been considered a violation.

---

[156] There is no evidence of record to address the extent to which the public school district at issue accepted federal funding, which would be necessary to sustain a claim under the FCA.  *See Wisconsin Bell, Inc. v. United States ex rel. Heath*, 604 U.S. 140, 148 (2025) (holding that reimbursement requests from privately-funded program that included delinquent contributions from the Treasury Department qualify as "claims" under the FCA because "the Government 'provides or has provided any portion of the money' requested" (citing 31 U.S.C. § 3729(b)(2)(A)(ii)(I)).

[157] *See Chance v. Kraft Heinz Food Co.*, 2018 WL 6655670, at *10-11 (Del. Super. Dec. 17, 2018) (agreeing, in dicta, with the first interpretation, but denying a motion to dismiss as premature).

[158] *See id.* at *11 (observing that "DWPA liability cannot be based upon reported conduct that does not ultimately turn out to be a violation").

[159] *See Kelsall v. BayHealth, Inc.*, 2015 WL 9312477, at *2 (Del. Super. Dec. 18, 2015) (seemingly applying this second interpretation in a motion to dismiss).

At the outset, Dr. Brown conceded in her deposition testimony that she had not seen the contract between the school and the Companies.[160] One cannot ascertain what is and what is not billable under a contract without knowledge of the contract's terms.

Furthermore, no reasonable jury could find that Mr. Korr advocated fraud. To this end, there is no dispute regarding what Mr. Korr told Dr. Brown and her co-workers in the meeting. He instructed them to ensure that they were billing the clients for emails, telephone calls, virtual communications, and site visits. Dr. Brown paraphrased Mr. Korr's words as follows: "We have got to pull some money in some way or another. Whether you have been bringing in donuts, sending e-mails, all of those things take time. Those e-mails just didn't write themselves."[161] The only other likely admissible evidence touching on Mr. Korr's statements come from his affidavit. There, he attests (1) that those contacts were billable under the contract, and (2) that he never advocated billing for actions not taken. No facts of record support a violation of the FCA in fact.

Finally, there is no dispute in the record that Mr. Korr spoke with Dr. Brown on the day after the meeting and clarified that he was not asking her to submit false or fraudulent bills.[162] Given an absence of any indication of fraud in the record, no reasonable jury could conclude that Mr. Korr did anything other than encourage his subordinates to bill for their communications and site visits as permitted by the contract. For these reasons, no facts alternatively support a *reasonable* belief that Mr. Korr encouraged fraud.

---

[160] At oral argument, Dr. Brown asserted that she had in fact reviewed the operative contract. However, that assertion falls outside the summary judgment record to which the Court must confine its decision.

[161] D.I. 82, Ex. 6 at 318:20-24; *accord* D.I. 82, Ex. 11 at ¶¶ 8-10 ("Therefore, I instructed the specialists to document these types of conversations with officials because they are clearly coaching services performed under the contract.").

[162] D.I. 82, Ex. 11 at ¶¶ 12-13.

On balance, there are no facts in the record to support a reasonable jury's finding that Akoben committed a violation of the FCA. Nor is there an available inference that Dr. Brown's mistaken belief was a reasonable one. As a result, Akoben's motion for summary judgment regarding the DWPA must be granted.

### V. CONCLUSION

**WHEREFORE**, for the reasons stated above, Defendants' motion for summary judgment is **GRANTED.**

**IT IS SO ORDERED.**

/s/ Jeffrey J Clark
Resident Judge
